LAURENCE ROY, Appellant, *v.* DONALD
LUSCHAR, Respondent.

No. 22451

August 5, 1992                              835 P.2d 807

[Rehearing denied February 1, 1993]

*Gunderson, Mehesan & Wenzel,* Reno, for Appellant.

*Robert Damon Spitzer,* Incline Village, for Respondent.

## OPINION

*Per Curiam:*

In 1983, Donald Luschar (Luschar) and William Courtney (Courtney) formed a partnership to acquire and construct office buildings in Incline Village, Nevada. Luschar's primary business experience was as a plumbing contractor. Luschar and Courtney's partnership dissolved later that year, and Luschar was left with an office building at 924 Incline Way (Incline Way), that was encumbered by a first mortgage for approximately $884,000.00 from Sacramento Valley Bank (SVB), and a second mortgage of $199,974.00 from Courtney. Courtney's deed of trust was eventually assigned to the Incline Investment Group (IIG).

In April of 1983, Luschar fell behind in his payments to SVB. Consequently, he sought the assistance of Laurence Roy (Roy), an old friend who was a licensed realtor in California. Roy gave Luschar a $60,000.00 loan, which Luschar secured with a deed granting Roy: (1) a third priority interest on the Incline Way property, and (2) a third priority interest on Luschar's residence, a house located at 626 Woodridge Circle (Woodridge). Several months later, Roy loaned Luschar an additional $4,600.00 as an extension on the first loan.

By the fall of 1983, Luschar was behind in his payments to SVB, IIG, and Roy, and he was attempting to sell the Incline Way property. In January of 1984, both SVB and IIG commenced foreclosure actions on Incline Way. Shortly thereafter, IIG gave Luschar notice that the property would be sold at a trustee's sale, and Luschar responded by filing a Chapter 11 bankruptcy petition.

Luschar's continuing efforts to procure a buyer for the Incline Way property were frustrated by the fact that he had declared bankruptcy. Therefore, on May 3, 1985, Luschar deeded title to Incline Way to Roy in order to facilitate the refinancing that was necessary for the sale of the property. Roy reconveyed his second and third priority deeds to Incline Way to Luschar by way of two separate deeds which stated that the indebtedness secured by the priority deeds had been fully repaid. Thereafter, Roy refinanced Incline Way with a $1,000,000.00 mortgage obtained from the American National Bank (ANB). At approximately the same time, Roy contracted to sell Incline Way to Hallicrafters, a buyer introduced to him by Luschar, for $1,600,000.00. He used a contract of sale for this purpose, because Hallicrafters' poor credit rating and low down payment led Roy to suspect that they might default and that he would have a better chance of retaining title under a contract of sale. Luschar never objected to the sale.

Hallicrafters defaulted on the contract of sale in February of 1986, after having paid Roy $150,000.00 as a down payment and $75,000.00 in additional installments.

On September 23, 1985, Luschar remortgaged his Woodridge home for $220,000.00 with Bank of America. He used approximately $80,000.00 of the proceeds to redeem the first mortgage on his home and paid the remaining $129,763.00 to Roy. At that time, Roy's liability, in conjunction with his loans to Luschar, included his guarantee on the new Woodridge mortgage and his liability on the $850,000.00 that remained on the American National Bank mortgage of the Incline Way property.

Luschar also owned another residential property, located at 554 Silvertip (Silvertip), which he held for investment purposes. Silvertip was encumbered by a mortgage for approximately $80,000.00, held by Comstock Bank, and Luschar was also having trouble meeting his obligations on that mortgage. On May 1, 1985, Luschar deeded Silvertip to Roy as security for an additional $63,000.00 that he borrowed to pay off Comstock Bank. The deed was also used as security for the $53,000.00 that Roy loaned to Luschar on May 13, 1985, to redeem the mortgage on the Woodridge property.

Immediately prior to refinancing the Woodridge property, Roy asked Luschar for two promissory notes that would reduce some of his outstanding debt to writing. Luschar testified that he understood that the purpose of these notes was to give Roy some tangible evidence of the existing debt in the event that something should happen to Luschar before the refinancing occurred. Luschar stated that at the time Roy requested the promissory notes, Luschar believed that he still owed Roy $108,000.00, although he later recalculated and determined that, by his estimation, Roy had already been overcompensated by an amount exceeding $300,000.00. On or about September 30, 1985, Luschar gave Roy two promissory notes, one for $30,000.00 and the other for $60,000.00, as evidence of the existing debt. These notes stated that they were payable on or before June 14, 1987, or upon sale of the Incline Way property, whichever occurred first. The $90,000.00 evidenced by the notes was secured by a deed of trust on the Woodridge property.

After deeding the Silvertip property to Roy, Luschar continued to manage the property until January of 1987, when Roy instructed the tenant to begin paying rent to him rather than to Luschar, because Luschar had neglected to pay the property taxes. As a result of Roy and Luschar's disagreement over who should receive the rent from Silvertip, Roy and Luschar stopped speaking to each other. On June 24, 1987, Roy sold Silvertip to a third party for $205,000.00, without informing Luschar of the sale.

Luschar made no payments on the $30,000.00 and $60,000.00 promissory notes, and the Incline Way property was not sold. Consequently, on October 25, 1989, Roy gave Luschar notice that he intended to foreclose on Woodridge. On February 22, 1990, shortly before the date the foreclosure was to take place, Luschar filed a complaint with the district court seeking an injunction prohibiting foreclosure on Woodridge and a declaration that the debts evidenced by the promissory notes had been satisfied. The district court ruled in favor of Luschar, finding that Roy had received the deed to Incline Way in lieu of repayment for the amounts he loaned to Luschar with respect to that property. Furthermore, the court found that all transactions not related to the Incline Way property were related to each other, and that, with respect to these other transactions, Roy had been overcompensated by approximately $16,000.00. However, the district court decided that "rough equity" favored allowing Roy to keep the overpayment.

Roy appeals, arguing that the loans relating to the Woodridge and Silvertip properties were part of the initial Incline Way transaction, and that therefore, he should be allowed to recoup the portion of the loss from his initial investment that was guaranteed by the $30,000.00 and $60,000.00 promissory notes. Roy estimates that Luschar still owes him $965,603.21, based upon the record he kept of the various loan transactions as they occurred. Luschar, on the other hand, maintains that Roy owes him $300,811.60, based upon an accounting he constructed immediately prior to trial. Despite the fact that Luschar claims that Roy was overpaid a substantial amount of money, Luschar did not file a counterclaim against Roy.

In order to determine the significance of the promissory notes and whether the debts they secure have been repaid, we must first consider whether the transactions involving the Incline Way property were wholly separate from Roy and Luschar's other transactions. Roy argues that the district court should not have found that these transactions were wholly separate, because such a finding necessarily implies that Roy's previously held priority interests in the Incline Way and Woodridge properties "merged" into his interest in the deed of title to Incline Way. We agree.

This court previously addressed the doctrine of merger as applied to a similar set of circumstances in Aladdin Heating v. Trustees, Cent. States, 93 Nev. 257, 563 P.2d 82 (1977). In *Aladdin,* respondents loaned the Kings Castle partnership $6,500,000.00 to finance the construction of a building. *Id.* at 259, 563 P.2d at 83. To secure the loan, Kings Castle gave respondents a promissory note and deed of trust covering both the

real property in the transaction and existing and future improvements. *Id.* As part of the lease transaction, the parties also entered into a sale-leaseback arrangement whereby respondents agreed to purchase the real property in question and lease it back to Kings Castle for a period of five years, when Kings Castle would repurchase it. *Id.* Pursuant to this arrangement, Kings Castle executed a grant, bargain, and sale deed in favor of respondents, which covered only the real property. When Kings Castle defaulted on its payments, the respondents foreclosed. *Id.*, 563 P.2d at 84. Appellants, who held junior mechanics' liens on the property, argued that the respondents could not foreclose on their deed of trust because that deed had been extinguished by merger when the respondents received the deed of sale. *Id.* at 261, 563 P.2d at 84-5. This court held that a merger had not occurred for two reasons: (1) the parties did not intend for a merger to take place, and (2) the interests said to merge were not coextensive and commensurate. *Id.*, 563 P.2d at 85.

The first consideration in determining whether a merger has occurred is the intent of the parties, especially the intent of the party in whom the interests are said to unite. *Id.* If the merger is not in the best interest of that party, no merger will be found. *Id.* In *Aladdin,* we held that the respondents could not have intended for their interest to merge because a merger would cause them to lose their priority over the holders of the mechanics' liens. Similarly, in the instant case, Roy asserts that his intent was always to retain title to Incline Way as a security interest. Merger of Roy's priority interests was clearly not in his best interest, because he incurred substantial loan obligations in order to refinance the property and he knew that there were potential problems with the prospective buyer. It was in Roy's best interest to hold the deed of title to Incline Way in order to obtain the refinancing necessary to protect his initial loan. There is also substantial evidence that the intent of both parties was that the deed of title only be held as a security interest. Luschar testified that he expected to receive any proceeds from the sale of Incline Way in excess of the amount he owed to Roy, and that one of the reasons the deed of title was conveyed was to obtain refinancing. In addition, the two promissory notes for $30,000.00 and $60,000.00 that Luschar gave Roy as evidence of his debt stipulated that they were redeemable upon sale of the Incline Way property. Thus, we conclude that Luschar has not presented sufficient evidence to establish that a merger was intended by the parties.

In addition, in *Aladdin,* we held that interests can only merge if they are coextensive and commensurate. *Aladdin,* 93 Nev. at 261, 563 P.2d at 85. In that case, we held that respondents' interests

were not coextensive and commensurate, because the deed of sale conveyed title to the real property only, whereas the deed of trust conveyed an interest in both the real property and existing and future improvements. *Id.* In the instant case, the interests said to be merged are also not coextensive and commensurate. Roy's initial loan was guaranteed by a third priority deed on Incline Way and a third priority deed on Woodridge, Luschar's residence. Because the deed of title that Luschar conveyed to Roy did not include any interest in the Woodridge property, the merged interests cannot be said to be coextensive and commensurate. Therefore, we conclude that the debt secured by Roy's priority interests in the Incline Way and Woodridge properties was not fully satisfied by transfer of the Incline Way deed of title to Roy.

Because Luschar's transfer of the Incline Way deed of title to Roy did not satisfy the underlying debt, we conclude that the loan transactions relating to the Incline Way property should not be considered separately from the transactions involving Woodridge and Silvertip. Rather, all of the transactions between Luschar and Roy should be considered together. Accordingly, we reverse this case and remand to the district court, with the recommendation that a master be appointed to conduct a hearing and accounting to determine the amount of money due to whichever party is actually owed, in addition to the amount of interest and costs owed to that party.